**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CRYSTAL DANIELLE MOSS,**

       **Plaintiff,**

**v.**                                 **Case No.: 2:16-cv-05016**

**NANCY A. BERRYHILL,[1]
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's motion for judgment on the pleadings and the Commissioner's motion for judgment on the pleadings, as articulated in their

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Acting Commissioner of the Social Security Administration, Nancy A. Berryhill, is substituted for former Acting Commissioner Carolyn W. Colvin as Defendant in this action.

memoranda. (ECF Nos. 9, 12).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, to the extent that it requests remand of the Commissioner's decision, (ECF No. 9); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.    <u>Procedural History</u>

On August 28, 2012, Plaintiff Crystal Danielle Moss ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of June 6, 2008, (Tr. at 250-257), due to "Syringomyelia, Migraines, Muscle Pain, Stomach Pain, Nausea, Back Spasms, Memory Loss, Vision Impairment, Speech Impairment, Pain in Legs, Pinched and Severed Nerves, Scoliosis, Weakness, Stiffness, Cognitive and Motor Problems." (Tr. at 285). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 40). Claimant filed a request for an administrative hearing, which was held on September 23, 2014 before the Honorable Peter Jung, Administrative Law Judge ("ALJ"). (Tr. at 55-77). By written decision dated October 22, 2014, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 40-49). The ALJ's decision became the final decision of the Commissioner on April 8, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer

opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 7, 8). Claimant then filed a Brief for Judgment on the Pleadings. (ECF No. 9). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12), to which Claimant filed a Reply. (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 27 years old at the time of the alleged onset of disability, and 34 years old at the time of the ALJ's decision. (Tr. at 40, 59). She has a high school education and communicates in English. (Tr. at 59-60, 284, 286). Claimant previously worked as a caregiver, telemarketer, tutor, communications technician, and loan adjuster for a bank. (Tr. at 48, 61-63, 287).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a

3

determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

4

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the

ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2013. (Tr. at 42, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 6, 2008, the alleged disability onset date. (Tr. at 42, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the lumbar and thoracic spines, migraine headaches, a seizure disorder, depression, anxiety disorder, and borderline intellectual functioning." (Tr. at 43, Finding No. 3).

As for the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 43-45, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently. The claimant is further limited to sitting six hours and standing/walking for a total of six hours in an eight-hour workday. The claimant is precluded from climbing ladders, ropes, and scaffolds, and is further limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. Additionally, the claimant should avoid concentrated exposure to temperature extremes, wetness, vibration and flashing lights. The claimant should avoid even moderate exposure to hazards, machinery and heights. Noise level is limited to Level Three-like

6

in a business office. The claimant is further limited to simple, repetitive, routine tasks, with no production race pace or quota type activity. The claimant is also limited to making simple work-related decisions and is limited to tolerating few or infrequent changes in a routine work setting. Lastly, the claimant should have no more than occasional interaction with the public.

(Tr. at 45-47, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of her past relevant work. (Tr. at 47-48, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 48-49, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1980, and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 48, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a janitor, hand bander, or price marker at the light exertional level. (Tr. at 48-49, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 49, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, she argues that the ALJ erred by failing to consider her impairment of syringomyelia; in fact, Claimant posits that the ALJ entirely overlooked the condition at steps two and three

of the sequential disability determination process.[2]  Claimant contends that this failure was particularly egregious, as syringomyelia is a serious medical condition associated with debilitating symptoms and is the primary condition advanced by Claimant as the cause of her disability. Second, Claimant asserts that the ALJ failed to comply with relevant regulations and case law when he based his assessment of Claimant's credibility entirely upon objective evidence. According to Claimant, the ALJ was required by 20 C.F.R. §§ 404.1529, 416.929 to consider additional factors precisely because symptoms may cause a greater level of impairment than can be shown through objective evidence alone. Claimant adds that the ALJ's conclusory discussion failed to supply an accurate and logical bridge from the evidence to the ALJ's finding that Claimant was less than credible.

In response, the Commissioner argues that, although the ALJ did not explicitly identify syringomyelia as an impairment at step two, he clearly considered all of Claimant's symptoms throughout the disability determination process. The Commissioner points out that the failure to include a specific condition as a severe impairment at step two is harmless error if the functional effects of the condition are

---

[2] **Syringomyelia** is a disorder in which a fluid-filled cyst forms within the spinal cord. This cyst, called a syrinx, expands and elongates over time, destroying the center of the spinal cord. Since the spinal cord connects the brain to nerves in the extremities, this damage results in pain, weakness, and stiffness in the back, shoulders, arms, or legs. Symptoms vary among individuals. Other symptoms may include headaches and a loss of the ability to feel extremes of hot or cold, especially in the hands. Signs of the disorder tend to develop slowly, although sudden onset may occur with coughing or straining. If not treated surgically, syringomyelia often leads to progressive weakness in the arms and legs, loss of hand sensation, and chronic, severe pain. In most cases, the disorder is related to a congenital abnormality of the brain called a Chiari I malformation. This malformation causes the lower part of the cerebellum to protrude from its normal location in the back of the head, through the hole connecting the skull and spine, and into the cervical or neck portion of the spinal canal. Syringomyelia may also occur as a complication of trauma, meningitis, hemorrhage, a tumor, or other condition. Symptoms may appear months or even years after the initial injury, starting with pain, weakness, and sensory impairment originating at the site of trauma. Some cases of syringomyelia are familial, although this is rare. *See Syringomyelia Information Page,* National Institute of Neurological Disorders and Stroke, National Institutes of Health, Bethesda, MD.

considered elsewhere in the decision. With respect to step three, the Commissioner asserts that Claimant can show no prejudice from the ALJ's failure to compare her symptoms to listing 11.19 (Syringomyelia), because Claimant's condition plainly did not meet or equal the severity criteria of that listing. The Commissioner also rejects Claimant's challenge regarding the ALJ's credibility analysis, noting that the ALJ followed the mandatory two-step process and supported his conclusions with references to the record. The Commissioner contends that the ALJ's discussion was sufficient to allow meaningful judicial review, and his decision was supported by substantial evidence.

## V.   **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The medical information relevant to Claimant's challenges is summarized as follows.

### A. Treatment Records

On April 23, 2005, Claimant presented to Saint Francis Hospital complaining of neck pain, numbness to hips and fingers, and anxiety related to a motor vehicle accident. (Tr. at 561-68).  Claimant's prior medical, family, and social history was negative. She had a negative physical examination, except for a sensation of "pins and needles" in her hands and symptoms of a panic attack. A CT scan of the neck was normal. Claimant was diagnosed with neck pain and panic attack. At discharge, Claimant was provided with prescriptions for Prozac, Ibuprofen, and Talwin. (Tr. At 567-68).

On May 31, 2005, Claimant presented to Charleston Area Medical Center ("CAMC") for a CT scan of the brain and the head due to headaches, light sensitivity,

blurred vision, and sharp pain in the temporal area whenever Claimant talked or laughed. (Tr. at 671). The results showed no evidence of acute intracranial disease.

On June 6, 2008, Claimant presented to the emergency department at Mount Carmel East Hospital with complaints of burning pain in the back of her neck and frontal head, as well as an intermittent tingling sensation in the back of her neck, secondary to a motor vehicle accident that occurred the day before. (Tr. at 356-63). Claimant stated that she was a restrained passenger in a vehicle that was rear-ended. She reported a history of chronic back and shoulder pain related to a motor vehicle accident in 2005; however, she was not currently taking any medication or receiving treatment for pain. On examination, Claimant was alert, oriented, and in no acute distress. Her cranial nerves were intact, and her head appeared atraumatic. Claimant displayed diffuse paraspinous muscle tenderness in the neck and upper thoracic area with some muscle spasm, but without obvious redness or deformity. Claimant's neurovascular status distal to the neck was within normal limits. She had no low back or chest wall tenderness. Claimant's mood and manner were appropriate. X-rays taken of the cervical and thoracic spine showed no evidence of fracture, prevertebral swelling, or subluxation. A straightening and slight reversal of the normal cervical curvature was seen, but the cervical bodies were otherwise in normal position and alignment. The disc spaces and posterior elements were intact, and there was no encroachment on the neural foramen of the cervical spine. Claimant's dorsal spine showed minimal curvature, with normal position and alignment of the vertebral bodies and no compression fractures. Claimant was assessed with acute neck and upper back strain. She received prescriptions for Lortab and Flexeril and was told to follow up as needed.

On July 24, 2008, Claimant presented to Christopher Demas, M.D., with

complaints of low back, neck, and thoracic pain; blurred vision; unstable gait; right leg pain; "fogginess;" nausea; and jerking muscles that began the month before after being involved in an automobile accident. (Tr. at 476). On examination, Claimant's neck appeared supple with no rigidity. There were muscular spasms along the trapezius bilaterally and, in fact, Claimant was involuntarily jerking while being examined. There were also spasms in the lumbar region with decreased range of motion of flexion to about forty-five degrees. She appeared to have a side-bending rotation limitation and tissue texture abnormalities. Her deep tendon reflexes were normal bilaterally, and no focal deficits were noted. However, the Rhomberg's test to detect poor balance was positive and Claimant walked with an unsteady gait. Dr. Demas ordered an MRI, scheduled physical therapy, and prescribed medication. Claimant was diagnosed with cervical, thoracic and lower lumbar strain; radiculitis; and visual disturbances with questionable head trauma.

On July 28, 2008, Claimant presented to Mount Carmel Medical Center for an MRI of the brain and lumbar spine due to memory and speech problems in addition to leg pain. (Tr. at 410-11). The MRI of the brain showed a small mucous retention cyst in the left maxillary sinus and a small Tornwaldt cyst in the nasopharynx; however, the ventricles were normal sized and of normal configuration. Thus, the radiologist deemed the results of the MRI of the brain to be normal. The MRI of the lumbar spine revealed very mild facet arthropathy and a disk bulge, but no significant central canal or foraminal stenosis and no focal disk protrusion.

On August 9, 2008, Claimant was seen by Dr. Demas for a refill of medication. (Tr. at 474). Dr. Demas noted during the examination that Claimant was involuntarily jerking, which made the examination difficult; nevertheless, her neurological

examination was otherwise normal. Deep tendon reflexes were +2/4 bilaterally, although there was decreased range of motion with flexion in the lumbar spine. Claimant reported that Flexeril and Xanax were not relieving her muscle spasms. Claimant was diagnosed with continued low back pain, muscle spasms, and involuntary jerking. Claimant had previously been advised to begin physical therapy, but had not done so. Dr. Demas recommended Claimant schedule a pain management consultation, begin physical therapy, and consider a neurology consultation. He also prescribed Valium as a muscle relaxant.

Claimant was seen by Lewis Seeder, M.D., a physical medicine and rehabilitation specialist, on August 20, 2008 with complaints of right shoulder pain, jerking motion of the lower back, and low back pain that extended to the legs with a tingling sensation in the toes, upper back pain, headaches, and memory loss since a motor vehicle accident in June 2008. (Tr. at 389-90). Claimant told Dr. Seeder she had taken a course of Flexeril and Zanaflex; however, these medications did not relieve the jerking of her back muscles. Claimant had also undergone chiropractic treatment with only temporary improvement. On examination, Claimant was alert and oriented. Claimant ambulated without use of aids. While Claimant was sitting, Dr. Seeder observed intermittent muscle contraction of the low back and pelvis that seemed to subside as Claimant got up and walked. The cervical range of motion was reduced in extension and lateral rotation. Spurling's was negative for a specific radicular complaints to the right and left. Hoffmann's sign bilaterally was absent, and the upper extremity deep tendon reflexes were not increased. There was no clinical kyphosis or scoliosis in the mid back. When seated, Claimant exhibited intermittent muscle contractions every five to seven seconds with lower back muscle groups showing very

tight lumbar paraspinals on the right side. When seated, straight leg raising test was non-radicular. The deep tendon reflexes of her lower extremities were equal at the knees with no evidence of ankle clonus. Dr. Seeder felt Claimant had a sustained cervical, thoracic, and lumbar paraspinal injury resulting from a prior motor vehicle accident. An MRI was ordered along with an EEG, and Claimant was prescribed a regular dose of Valium.

On August 21, 2008, Claimant underwent an MRI of the cervical spine. (Tr. at 412). During the MRI, Claimant exhibited involuntary movements, which limited some sequences. The radiologist interpreted the MRI to show unremarkable alignment of the cervical spine, as well as preserved vertebral body heights and disc spaces. The central canal appeared adequate throughout, and there was no central canal or neural foraminal stenosis observed at C2-3, C3-4, C4-5, C5-6, C6-7 or C7-T1. There was a thin, 1.5 millimeter, persistent central canal of the cord. Overall, the MRI was determined to be unremarkable.

On August 27, 2008, Lewis Seeder, M.D., wrote to Marvin Im, D.O., with the results of Claimant's recent cervical spine MRI. (Tr. at 387-88). Claimant had been examined by Dr. Seeder for complaints of low back pain and jerking, which had increased in intensity. Dr. Seeder noted the MRI was unremarkable with no evidence of a syrinx or spinal cord irritation. Dr. Seeder performed a limited EMG that showed intermittent muscle firing in the gluteal muscle groups, but no apparent firing in the lumbar paraspinals in association with muscle jerking. There were no changes seen in the proximal lower extremity muscle groups. Dr. Seeder assigned no specific etiology to Claimant's muscle cramping and felt that she could benefit from a neurology consultation and possible use of Botox.

Claimant returned to Mount Carmel East Medical Center on September 18, 2008 for an MRI of the pelvis due to complaints of pain in the tailbone, right buttock, low back, and right lower extremity with radiculopathy. (Tr. at 409, 413). The MRI revealed an intact bony pelvis, sacroiliac joints, sacrum, and coccyx, without evidence of pelvic bone fracture, bone contusions, sacrococcygeal fracture, malalignment, or abnormalities in either hip joints.

At Dr. Seeder's request, Claimant underwent a neurology consultation by Kristin M. Johnson, D.O., on October 15, 2008. (Tr. at 371-74). Claimant's primary complaint was intermittent muscle cramping and abdominal twitching, causing her to be severely nauseated. She had associated weight loss and diarrhea. She also claimed to have muscle weakness and clumsiness, fever, tremor, neck pain, numbness, tingling, difficulty walking, back pain, depression, memory loss, migraine headaches, and a feeling of "almost" passing out. Claimant reported trying multiple medications to alleviate her symptoms, without success, and complained that her symptoms significantly impaired her ability to function. Her current medications were Valium and hydrocodone. During the physical examination, Claimant's blood pressure and weight could not be recorded due to abdominal jerking which made her unable to relax or stand still on the scale. Claimant had multiple episodes of left abdominal wall contractions causing a side bend of the shoulders and slight abduction of the hip. The contractures primarily affected the left oblique muscles and occurred at random intervals, one to one and half minutes apart. Claimant was able to suppress the movements, but even then, twitching could be seen. Nonetheless, her motor strength measured 5/5 in all extremities. Muscle tone and sensation were normal, as was her coordination and gait except during the intermittent abdominal spasms. Claimant's

14

mental status examination and speech were normal. Dr. Johnson believed the findings were consistent with segmental myoclonus,[3] most predominately in the oblique abdominal muscles, and was likely secondary to a thoracic spine injury caused by Claimant's motor vehicle accident. Dr. Johnson advised that if the abnormality were due to a spinal cord injury, her current medications were ineffective. Dr. Johnson also did not believe that administering Botox would ease Claimant's symptoms; instead, she prescribed carbamazepine (Tegretol), a medication used to treat seizures and nerve pain, and ordered an MRI of Claimant's thoracic spine.

Two days later, Claimant presented to Southwest Health Center for an MRI of the thoracic spine. (Tr. at 367, 380, 383). The MRI revealed a linear T2 hyperintensity centrally within the thoracic cord from T6-T7 through T9-T10, the largest being found at the T9 level. The findings were consistent with a syrinx. The thoracic cord was normal in size. The radiologist felt a follow-up MRI with post contrast images should be considered to evaluate for abnormal cord enhancement. There was no focal disc herniation or central or foraminal stenosis at any level, and no acute bony abnormality

---

[3] Myoclonus describes a symptom and not a diagnosis of a disease. It refers to sudden, involuntary jerking of a muscle or group of muscles. Myoclonic twitches or jerks usually are caused by sudden muscle contractions, called positive myoclonus, or by muscle relaxation, called negative myoclonus. Myoclonic jerks may occur alone or in sequence, in a pattern or without pattern. They may occur infrequently or many times each minute. Myoclonus sometimes occurs in response to an external event or when a person attempts to make a movement. The twitching cannot be controlled by the person experiencing it. In its simplest form, myoclonus consists of a muscle twitch followed by relaxation. A hiccup is an example of this type of myoclonus. Other familiar examples of myoclonus are the jerks or "sleep starts" that some people experience while drifting off to sleep. These simple forms of myoclonus occur in normal, healthy persons and cause no difficulties. When more widespread, myoclonus may involve persistent, shock-like contractions in a group of muscles. In some cases, myoclonus begins in one region of the body and spreads to muscles in other areas. More severe cases of myoclonus can distort movement and severely limit a person's ability to eat, talk, or walk. These types of myoclonus may indicate an underlying disorder in the brain or nerves. Causes of myoclonus include brain or spinal cord injury, stroke, brain tumors, infection, kidney or liver failure, and other disorders. *See Myoclonus Fact Sheet*, **NIH Publication No. 12-4793**, National Institute of Neurological Disorders and Stroke, National Institutes of Health.

was seen.

Claimant returned to Dr. Demas on October 17, 2008. She continued to complain of nausea and vomiting most likely caused by neuropathic pain syndrome. (Tr. at 472). Claimant was provided a prescription for Phenergan. Dr. Demas deferred further treatment to Claimant's neurologist. That same day, Dr. Demas advised Claimant by letter that he would no longer be prescribing narcotic pain medication as he had been informed that other physicians were prescribing those medications for her. (Tr. at 467).

Claimant returned to Southwest Health Center, on November 7, 2008 for additional post contrast enhanced MRI images to follow up on the tiny syrinx found in October 2008. (Tr. at 375, 381, 382). The MRI revealed no abnormal enhancement within the thoracic spinal cord, including at the level of the thoracic cord syrinx.

Claimant presented to Dr. Seeder's office on November 11, 2008 reporting a decrease in abdominal and trunk cramping since starting Tegretol. (Tr. at 386). However, Claimant noted some increased symptoms after running out of Valium. Claimant also reported that her pain had decreased with hydrocodone. Claimant told Dr. Seeder she experienced light sensitive headaches, as well as a numbness and tingling sensation in the right foot affecting the third, fourth, and fifth toes. Dr. Seeder reviewed the report from Dr. Johnson and the MRI of Claimant's thoracic spine and performed an examination. He noted an intact gait; intermittent muscle cramping of the trunk; lower extremity deep tendon reflexes of 1+ at the knees and trace at the ankles; no evidence of neurologic weakness in the muscles, and no evidence of ankle clonus. Dr. Seeder diagnosed Claimant with thoracic syrinx, segmental muscle cramping, and cervical/lumbar paraspinal muscle strain. Claimant was provided a

16

refill for Valium. Dr. Seeder also advised Claimant to follow up with her neurologist for treatment of headaches and the diagnosis of myoclonus. The following day, Dr. Seeder advised Claimant he would no longer be providing medical care as Claimant was being treated by a neurologist. (Tr. at 385).

Claimant was examined by Dr. Johnson on December 3, 2008 in follow up of her segmental myoclonus. (Tr. at 368-69). Claimant reported that she was markedly improved since taking Tegretol. Her myoclonus was down to a minimum. She experienced some numbness in her right foot when getting out of bed in the morning and had pain behind her leg, which she believed was related. Claimant also complained of severe headaches, mid and low back pain, and hip pain. On examination, Claimant's mental status examination was normal. Her cranial nerves were grossly intact, and her pupils were normal and reactive. No myoclonus was noted. Claimant's motor examination was 5/5 throughout, and her sensory, coordination, and gait examinations were normal. Her reflexes were brisk throughout. Dr. Johnson reviewed Claimant's most recent MRI of the thoracic spine, noting findings consistent with a thoracic syrinx from the T6-7 through T9 levels. Dr. Johnson believed Claimant's primary condition was segmental myoclonus that caused vastly disruptive symptoms, including abdominal jerking and left-sided bending. Claimant also experienced gastrointestinal symptoms secondary to the myoclonus. However, the condition had improved greatly with the use of Tegretol. Dr. Johnson felt that Claimant's myoclonus and related symptoms would continue to decrease in frequency and would most likely resolve in time. Dr. Johnson also felt that Claimant's headaches were probably migrainous in nature, which was not uncommon to see in a post-traumatic patient. Because the headaches occurred only occasionally, Dr. Johnson did not think a daily

prophylactic medication was necessary. Claimant advised that she was no longer seeing her primary care physician, so Dr. Johnson explained the importance of Claimant finding a new physician to coordinate her care. In the meantime, Dr. Johnson prescribed physical therapy to address Claimant's musculoskeletal pain.    Claimant was given samples of Treximet for migraine relief, and her dosage of Tegretol was increased.

On January 27, 2009, Claimant underwent an MRI of the brain and lumbar spine for symptoms of memory difficulty, speech problems, and leg pain post motor vehicle accident. (Tr. at 378-79). Her brain MRI was normal. The lumbar MRI showed very mild facet arthropathy, no significant central canal or foraminal stenosis, and no focal disk protrusion.

Claimant was seen for a neurosurgical consultation by Lisa L. Choung, M.D., on February 19, 2009. (Tr. at 402-05). Dr. Choung noted that it was difficult to conduct the examination as Claimant, although alert and oriented, was very tearful, anxious, and irritable. Claimant complained of intermittent pain most significantly on the left side of her mid to lower thoracic spine radiating into her anterior abdominal wall. She also reported pain in her neck, frequent headaches, and low back and lower extremity pain. Claimant stated that she had some pain relief with Tegretol, Valium, and hydrocodone.  On examination, Dr. Choung observed Claimant having episodes of left-sided abdominal wall contractions. Claimant's cranial nerves were intact, and she was alert and oriented. Her reflexes of the biceps, triceps, knees, and ankles were brisk. Claimant had 5/5 strength in the bilateral upper and lower extremities, with intact sensation to light touch throughout. Claimant was diagnosed with chronic left-sided thoracic and abdominal pain with myoclonus, and chronic neck and low back pain. Dr.

Choung again stressed her difficulty in obtaining a coherent history from Claimant due to Claimant's tearfulness. Dr. Choung expressed concern over Claimant's current emotional state and recommended that she undergo a full psychological workup. In addition, Dr. Choung noted that Claimant had contacted the office several times asking for a prescription of Valium, prior to Claimant's initial examination with Dr. Choung. Claimant advised Dr. Choung that she had bought hydrocodone from a "friend" and was using marijuana. Consequently, Dr. Choung recommended an evaluation with an addictionologist to evaluate Claimant for possible addiction. Claimant's current medication regimen included Tegretol, Valium, and hydrocodone prescribed by Dr. Johnson. Dr. Choung added a trial of Lyrica for pain control. On April 7, 2009, Claimant called Dr. Choung's office and reported that she was doing "100% better" with Lyrica. (Tr. at 407).

Claimant returned to Dr. Demas on February 25, 2009 complaining of spasms and peripheral neuropathy. (Tr. at 469). Claimant requested Lyrica. Dr. Demas agreed to provide a prescription for Lyrica and refilled the prescription on September 12, 2009 and January 13, 2010. (Tr. at 465, 468). Claimant returned on January 26, 2010 reporting her mental status had improved after a long episode of "not thinking clearly" although she continued to have neuropathic pain for which she received treatment from a neurologist. (Tr. at 464). Dr. Demas felt Claimant's mental status and neurological status had improved, so he continued Claimant's prescription for Lyrica. Claimant was diagnosed with concussion with post-concussive syndrome, possibly posttraumatic stress disorder ("PTSD"), and spinal injuries with syrinx formation, neurologically improving.

Claimant returned to Mount Carmel East Hospital on February 16, 2010 for x-

rays of the thoracic, lumbar, and cervical spine. (Tr. at 414-16). An x-ray of her thoracic spine revealed a minimal curvature of the lower thoracic and upper lumbar spine convex to the left. The vertebral bodies were normal in height, and the disk spaces were preserved. Pedicles were found intact, and there were no fractures seen. X-rays of the lumbar and cervical spine were also found to be normal.

On March 2, 2010, Claimant presented to Eastside Health Center for an MRI of the cervical, thoracic, and lumbar spine. (Tr. at 477-82). Incidental note was made on the cervical spine MRI of several nasopharyngeal mucous retention cysts that were benign; however, the results were otherwise unremarkable. The MRI of the thoracic spine revealed a stable cyst/syrinx in the mid thoracic spinal cord from T7-T10 measuring one millimeter in maximal AP and transverse dimension, stable from the October 2008 MRI. The MRI of the lumbar spine was normal.

On April 28, 2010, Ted Garman, DPT, performed an initial physical therapy evaluation. (Tr. at 441-42). Claimant complained of pain and tingling in the bilateral lower extremities; low back pain with burning sensation into the bilateral hips; numbness and tingling in the right toes; and muscle spasms, mostly in the left side, causing jerking motions in the low back. Claimant rated her pain as ranging from seven to ten on a ten-point pain scale. She also reported problems sleeping, standing, sitting, walking, bending, lifting, and carrying. Claimant walked with an antalgic gait in the forward flexed position. She exhibited mild postural limitation with a forward head and rounded shoulder position. Claimant demonstrated notable chest breathing with minimal diaphragmatic control. There was obvious quadratus lumborum spasm on the left that caused significant jerking and hip hiking, lasting approximately fifteen minutes during the evaluation. Physical therapy was recommended for three times per

week for four weeks. Mr. Garmen felt Claimant's prognosis was good.

On May 2, 2010, Claimant was seen at the Grant Medical Center's emergency department after being assaulted. (Tr. at 418-437). Claimant reported that she was with her boyfriend, who had a substance abuse problem, and he became angry with her. He punched her several times in the face. She complained of headache, nose pain, and pain with eye movement. She denied neck, back, and abdominal pain. On examination, Claimant was noted to have swelling of the nose, periorbital edema, ecchymosis and hematoma at the nose and forehead. Neurologically, she was intact. CT scans of the brain and facial bones were performed. Claimant's brain scan was normal; however, the facial scan revealed comminuted nasal bone fractures. Claimant was diagnosed with nasal fracture and closed head injury. She was given Toradol and Vicodin in the emergency room for pain, was given a prescription for Vicodin at discharge, and was instructed to follow up with an otolaryngologist.

Claimant completed twelve additional sessions of physical therapy: April 28, April 30, May 3, May 5, May 7, May 10, May 12, May 21, May 26, May 28, June 1, and June 3, 2010. (Tr. at 448-459). On June 28, 2010, Mr. Garner provided Dr. Demas with a status report. (Tr. at 440). The report detailed that Claimant had progressed very well with manual therapy to control intense low back spasms. Claimant increased her core strength and awareness during therapy; however, at her last session on June 3, Claimant reported having had a re-occurrence of lumbar pain and spasms. She did appear to obtain good response from manual therapy at that visit. Claimant was provided verbal and written instructions for home exercise and discharged from therapy.

Claimant was examined by Dr. Demas on August 13, 2010 for complaints of

headache accompanied by dysarthria and stuttering, which interfered with her ability to concentrate. (Tr. at 462). Claimant also complained of pain in the paracervical muscles, in the trapezius muscles that traversed from the shoulder girdle to the C spine, and in the paralumbar muscles. Claimant walked with a slight antalgic gait, and Dr. Demas noted that Claimant's quadriceps demonstrated some quiver. Claimant was advised to return to physical therapy and her neurologist.

Claimant presented to Thomas Memorial Hospital on April 11, 2012 with complaints of chronic back pain. (Tr. at 678-80). On examination, Claimant's abdomen appeared normal. There was back tenderness as well as soft tissue tenderness in the mid and low central lumbar area. Muscle spasms were present in the mid and low central lumbar area. Claimant had limited range of motion in the lumbar spine and decreased right lateral bending, left lateral bending, and rotation to the right and left. Claimant was alert and oriented with normal mood and affect. She reported having been out of medicine for "several days." Claimant was assessed with chronic back pain of the lumbar spine and provided prescriptions for a two-week supply of non-narcotic pain medication.

A short time later, on April 30, 2012, Claimant presented to Saint Francis Hospital with complaints of chronic back pain, reporting that she was out of medication. (Tr. at 532-48). Claimant was assessed with chronic pain, treated, and released.

Claimant presented to Thomas Memorial Hospital on May 4, 2012 reporting she was out of medication for treatment of chronic pain and requested a refill of her medication. (Tr. at 675-77). She attributed the back pain to two prior motor vehicle accidents. Her physical examination was unremarkable, and Claimant was provided

22

medication refills.

On May 11, 2012, Claimant presented to CAMC with complaints of migraine headache and low back pain. Claimant also requested a refill of her medications. (Tr. at 572-73). Claimant reported increased back pain since she stopped taking Flexeril, Neurontin, and Tegretol. On examination, Claimant's abdomen was normal, as was her strength in the upper and lower extremities. Claimant's deep tendon reflexes were symmetrical with normal sensation to upper and lower extremities. She had no significant deformities, cyanosis, or edema to the musculoskeletal areas, but did have tenderness to palpation of the lumbosacral and lower thoracic spine with some low back spasms at trigger points. Claimant was assessed with migraine headache and chronic back pain. She was given refills of her medication to last for 10 days and was discharged in stable, improved condition.

Claimant returned to Thomas Memorial Hospital on May 23, 2012 for complaints of earache and requesting medication refills of Flexeril, Neurontin, and Tegretol for chronic back pain. (Tr. at 672). Claimant was given an antibiotic for the earache and provided refills of her requested medications.

On August 2, 2012, Claimant presented to West Virginia Health Right to establish care. (Tr. at 706). Claimant reported a history of thoracic syrinx. Claimant returned on August 31 for medication refills of Flexeril, Flonase, Neurontin, and Tegretol. (Tr. at 707).

On December 13, 2012, Claimant presented to West Virginia Health Right complaining of visual symptoms, balance and speech problems, along with back pain. (Tr. at 708). Claimant was assessed with thoracic syrinx, although the examining physician felt it was doubtful that Claimant's symptoms were due to a cord syrinx. Her

prior medical records were ordered for review. Claimant returned to Health Right on January 24, 2013 for medication refills, which were provided. (Tr. at 710).

Claimant returned to West Virginia Health Right on March 8, 2013 complaining of jerking movements in her stomach and "seizure like things in my head," blurred vision and metallic taste in her mouth. (Tr. at 711). Claimant was observed to be tearful. She was diagnosed with a headache. Claimant reported her neurologist had told her she did not need to take Tegretol, so it was not prescribed for her at this visit. Claimant returned on April 13 for follow-up. (Tr. at 713). At that time, Claimant's medication regimen included Flexeril, Neurontin, Nasonex, Tegretol, and ibuprofen.

On April 24, 2014, Claimant presented to CAMC Family Care Center for treatment of right breast abscess. (Tr. at 714-17). A review of systems was positive for abdominal pain and gastrointestinal issues, anxiety, depression, back pain, dysmenorrhea, headache, and malaise. James Horn, FNP-BC documented that Claimant took Remeron, Gabapentin (Neurontin) and Tegretol for treatment of anxiety, depression, and seizure disorder as prescribed by Dr. Kodali. He noted Claimant's seizure disorder was stable with Tegretol. However, Claimant had lost seven pounds since her last visit, reportedly due to abdominal issues. Claimant's physical examination was normal except for the right breast abscess.

Claimant returned for follow up on August 13, 2014. (Tr. at 718-21). The abscess appeared to be healing. Claimant reported continued treatment for anxiety, depression and PTSD with Dr. Kodali, who prescribed Neurontin and Tegretol; however, he had discontinued Remeron due to its adverse side effects. Claimant reported experiencing a seizure in the past one to two days in the form of blurry vision, confusion, changed breathing pattern, head pressure, and anxiety. Claimant also reported some lumbar

spine pain with sciatic involvement into the right leg. She questioned whether she might need to restart pain medicine. Claimant also reported occasional migraine headaches that were sometimes associated with seizures for which she received treatment from Dr. Joseph. Claimant's physical examination revealed good toe strength, positive straight leg raise on the left at forty-five degrees, and lumbar spine tenderness with moderate pain on range of motion. Claimant was advised to continue taking Tegretol, follow up with Dr. Joseph, and continue taking Neurontin and Flexeril in addition to Sulindac and ibuprofen. Claimant was assessed with epilepsy, unspecified, without mention of intractable epilepsy; lumbago; anxiety; and migraine headaches.

On August 27, 2014, Claimant presented to CAMC Family Medicine Center with complaints of migraine headaches and pain in the lower thoracic spine to the right flank. (Tr. at 722-25). Claimant reported she felt this was happening because her "syrinx is progressing." She stated that the pain was "draining the life" out of her. She had no energy or appetite, and her jerking movements caused nausea. Claimant described her migraine headaches as pain behind the eyes and photophobia, and they were accompanied by seizures. Claimant was very emotional. She indicated that her seizures seemed worse since she began taking Sulindac, adding that she was "exhausted." Claimant also described moderate symptoms relating to the syrinx, stating they occurred daily, were worse upon wakening, and included weakness in her right hand, arm, and leg. On examination, Claimant's strength was measured 4+/5 in the bilateral upper and lower extremities. She had hypertonicity of the bilateral thoracic paraspinals. Her deep tendon reflexes were 2+ in the bilateral upper and lower extremities, although there was decreased sensation in varying patterns throughout.

Claimant was quite tearful when discussing her health issues. Mary Maurer, D.O., ordered an MRI of the spine and brain in addition to continuing Claimant's medication regimen of Tegretol, Flexeril, Neurontin, and Inderal.

Claimant returned to CAMC Family Medicine Center on September 18, 2014 reporting chronic pain occurring daily that was moderate in severity and controlled, although stress exacerbated her pain. (Tr. at 726-30). Claimant felt that Inderal improved her migraine symptoms; however, she believed her seizure symptoms were moderate and were poorly controlled. She described a recent seizure as feeling hot followed by generalized pain and then feeling emotional. Claimant described her depression/mood symptoms as moderate, chronic, and "fairly" well controlled noting she was "sad and frustrated" about her pain. Claimant's physical examination was normal. Claimant was diagnosed with seizure disorder, syrinx of the spinal cord, and anxiety.

On October 21, 2014, Dr. Maurer wrote to Claimant to advise her of the MRI results. (Tr. at 352). The MRI of Claimant's brain was normal. The MRI of her cervical spine revealed a "small" syrinx from C4-T1; the thoracic MRI showed a "tiny" syrinx at T8; and the lumbar spine did not reveal any evidence of a syrinx. Claimant was advised to follow up with her neurologist.

Claimant returned to CAMC Family Medicine Center on October 24, 2104 with complaints of chronic, poorly controlled seizures and migraines, which she believed were getting worse. (Tr. at 731-35). Claimant felt her syrinx symptoms were mild, and although chronic, they were stable. Her medical imaging was reviewed. Claimant's physical examination was normal. Her strength in the bilateral upper and lower extremities measured 5/5. Claimant was assessed with seizure disorder, syrinx of

spinal cord, and migraine headaches. She was advised to follow up with her neurologist, not drive, bathe or shower unsupervised, swim, care for children, or cook unattended if the seizure symptoms were not controlled. Claimant was advised to continue taking Zofran and stop taking Inderal due to its side effects.

### B. Evaluations and Opinions

On February 19, 2013, Kara Gettman-Hughes, M.A., conducted a neuropsychological evaluation, which included a clinical interview; a mental status examination; review of records; and administration of the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV"), Neurobehavioral Cognitive Status Examination ("Cognistat"), and Trail-Making Test. (Tr. at 685-92). Claimant reported she was applying for disability due to severe migraine headaches, syringomyelia, depression, and memory and concentration issues. Claimant described her health problems as syringomyelia that caused back pain, occasional muscle jerking, daily migraines, back spasms, nausea, blurred vision, light sensitivity, muscle stiffness and weakness, and dislocated pelvis; however, she denied having seizures.

Psychologically, Claimant reported a history of episodic depression and worrying excessively. She described feeling sad and helpless and stated that she had panic attacks with a myriad of associated symptoms. Claimant also experienced very frequent headaches, which she believed were caused by stress and anxiety. She had problems with her memory, and her ability to concentrate had declined.

On the WAIS-IV, Claimant scored 83 in verbal comprehension, 81 in perceptual reasoning, 89 in working memory, 62 in processing speed with a full scale IQ of 75. Based upon Claimant's scores, which were considered valid, Ms. Gettman-Hughes found Claimant's general cognitive ability was within the borderline range of

intellectual functioning. Ms. Gettman-Hughes opined that Claimant might experience difficulty keeping up with her peers in a wide variety of scenarios that would require thinking and reasoning ability. On the Cognistat, Claimant received largely average scores, with mild impairment in calculation. Claimant was able to complete the Trail-Making Test, but took considerably longer than the norm for task completion. Test scores indicated that Claimant had a slowed processing speed, which was consistent with her complaints. Ms. Gettman-Hughes believed Claimant's cognitive abilities fluctuated with variables such as fatigue and pain; however, her overall cognitive deficits were not significant enough to warrant a diagnosis.

On mental status examination, Claimant appeared cooperative with fair eye contact. Her speech was responsive and coherent, but somewhat verbose. She was oriented in all spheres. Claimant's mood was mildly anxious and her affect was restricted. Claimant's thought process, thought content, and perception were within normal limits. Her judgment was mildly impaired, and her insight was fair. She showed no evidence of psychomotor agitation. Claimant's immediate and recent memory was intact and her remote memory was fair. Claimant's concentration was intact; however, her persistence was mildly impaired and her pace slightly slow. Based upon her interactions with the examiner and others, Claimant's social functioning was assessed as mildly impaired. Claimant reported that her daily activities consisted of attempts to do some housework, read or use her computer; although, she was very limited in these activities due to migraine headaches.

Ms. Gettman-Hughes diagnosed Claimant with major depressive disorder, moderate, without psychotic features, chronic; generalized anxiety disorder; panic disorder without agoraphobia; and pain disorder associated with both psychological

factors and a general medical condition. She felt that Claimant's prognosis was poor. On March 20, 2013, Ms. Gettman-Hughes prepared an addendum to her report based on her review with Lester Sargent, M.A., regarding Claimant's education and work history. (Tr. at 701-2). She revised her diagnoses to include major depressive disorder, recurrent, moderate, without psychotic features, chronic; generalized anxiety disorder; panic disorder, without agoraphobia; pain disorder associated with both psychological factors and a general medical condition, and borderline intellectual functioning.

On March 6, 2013, Nilima Bhirud, M.D., completed a Disability Determination Evaluation. (Tr. at 694-700). Claimant reported injuries sustained in a 2008 car accident, including a syrinx from T6 to T9 of the thoracic spine; jerking of the left side of her body, and abdomen, which had mostly subsided; nausea; migraines; and back pain. Claimant described her back pain as constant, sharp, dull, stabbing, aching and burning in character, with radiation to the right leg. Prolonged standing and walking increased the pain. On examination, Claimant could stand on each foot at a time, heel and toe walk, but could not squat. Claimant's gait was normal, she did not require the use of ambulatory devices, and she could walk in tandem gait. Claimant appeared comfortable in both standing and seated positions. Her cranial nerves were normal. There were no sensory or motor deficits and her reflexes measured 2+ and symmetrical. Claimant's cervical spine was not tender and exhibited normal range of motion. She had moderate tenderness of the thoracic spine with slight scoliosis to the right. She also had mild tenderness of the lumbar spine. Claimant' straight leg raising test was negative on both sides, and her hand joints and grips were normal. She had no swelling or tenderness to the shoulders, elbows, hips, knees or ankles and all exhibited normal range of motion. Dr. Bhirud diagnosed Claimant with a history of migraine

headaches and history of back pain, that manifested as tenderness over the thoracic and lumbar spine with forward flexion of the lumbar spine at 70 degrees.

On March 19, 2013, Amy Wirts, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 90-92). Dr. Wirts found Claimant could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand, walk and/or sit about six hours in an eight-hour workday and had unlimited ability to push and pull with the weight restrictions. Claimant had certain postural limitations in that she could frequently climb ramps, stairs, balance, stoop, kneel, crouch and crawl; however, she could only occasionally climb ladders, ropes or scaffolds. Claimant had no manipulative, visual or communicative limitations. As for environmental limitations, Claimant had unlimited ability for exposure to extreme heat, wetness, humidity, noise or fumes, odors, dusts, gases or poor ventilation; however, she should avoid concentrated exposure to extreme cold, vibrations, or hazards, such as machinery or heights. Dr. Wirts found Claimant mostly credible.

On March 25, 2013, Ann Logan, Ph.D., completed a Psychiatric Review Technique. (Tr. at 88-89). Under the Listings of 12.02 (organic mental disorders), 12.04 (affective disorders), 12.06 (anxiety related disorders), and 12.07 (somatoform disorders), Dr. Logan found medically determinable impairments that did not precisely satisfy the diagnostic criteria. Claimant was mildly limited in her activities of daily living and maintaining social function; however, she was moderately limited in maintaining concentration, persistence and pace. There was no evidence to establish the paragraph "C" criteria and no episodes of decompensation. Under additional explanation, Dr. Logan opined that Claimant's medically determined impairments were severe. On May 16, 2013, Joseph A. Shaver, Ph.D., confirmed the assessment as

30

written. (Tr. at 122-24).

By report of the same date, Dr. Logan completed a Mental Residual Functional Capacity Assessment. (Tr. at 92-94). Dr. Logan found Claimant was not significantly limited in her ability to remember locations and work-like procedures or understand and remember very short and simple instructions; but, she was moderately limited in her ability to understand and remember detailed instructions. Claimant was not significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, or complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; however, Claimant was moderately limited in her ability to carry out detailed instructions, or maintain attention and concentration for extended periods of time. Dr. Logan summarized Claimant's mental RFC by opining that Claimant had the ability to engage in work-like activity as well as understand, recall, and carry out routine, repetitive instructions in a sustained manner. Dr. Logan found Claimant had no social or adaption limitations. On May 16, 2013, Joseph A. Shaver, Ph.D., confirmed the assessment as written. (Tr. at 127-28).

Upon reconsideration, Thomas Lauderman, D.O., completed a Physical Residual Functional Capacity Assessment. (Tr. at 125-27). After a review of the medical records, Dr. Lauderman found the medical file was insufficient for the time period prior to Claimant's last insured on March 31, 2012; however, going forward, Dr.

31

Lauderman found Claimant could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand, walk or sit about six hours in an eight-hour workday and had unlimited ability to push and/or pull with the weight restrictions. Claimant could frequently climb ramps or stairs, balance, stoop, kneel, crouch or crawl; however, she could only occasionally climb ladders, ropes or scaffolds. Claimant had no manipulative, visual or communicative limitations. As for environment limitations, Claimant had unlimited ability for exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, or poor ventilation; however, she should avoid concentrated exposure to extreme cold, vibration, or hazards, such as machinery or heights. Dr. Lauderman found Claimant's statements to be mostly credible.

## VI.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ

followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. <u>Discussion</u>

### A. The ALJ's Analysis of Claimant's Syringomyelia

Claimant alleges that the Commissioner's decision is not supported by substantial evidence, because the ALJ failed to find Claimant's syringomyelia to be a severe impairment at the second step of the disability determination process. Claimant concedes that this error might have been harmless if the ALJ had later corrected it. However, Claimant argues that the error was not harmless, because the ALJ never addressed syringomyelia at any step of the process. As an example, Claimant points to the ALJ's failure to consider listing 11.19 (Syringomyelia) at step three, notwithstanding evidence in the record "raising the distinct possibility" that Claimant's condition, especially when combined with her other impairments, met or equaled that listing. (ECF No. 9 at 13).

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §416.921(a). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition

or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a potentially disabling impairment, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of nondisability is made at step two, and the process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) (per curiam) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

In this case, the ALJ found, in relevant part, that Claimant had severe impairments of "degenerative disc disease of the lumbar and thoracic spines, migraine headaches, [and] a seizure disorder." (Tr. at 43). The ALJ provided no explanation for how he reached that determination, nor did he mention Claimant's syringomyelia. Considering that Claimant had a documented diagnosis of syringomyelia and received treatment for symptoms associated with that condition, the ALJ erred by not addressing its severity at step two. Moreover, the basis for his inclusion of degenerative disc disease of the thoracic spine as a severe impairment is unclear. Although an MRI reflected mild facet arthropathy of the lumbar spine, Claimant's thoracic films did not contain similar findings and no qualified medical source diagnosed her with

34

degenerative disc disease of the thoracic spine. To the contrary, Claimant was diagnosed with syringomyelia based upon radiographic findings of a syrinx at T6-7 through T9-10. While it is possible that the ALJ believed the functional effects of a thoracic syrinx replicated those of degenerative disc disease, his rationale is unknown, as he never provided any explanation for his step two findings.

Nevertheless, based upon the ALJ's finding that Claimant had several severe impairments, the disability determination process proceeded to step three. From that perspective, even if the ALJ erred by not considering Claimant's syringomyelia to be severe, Claimant suffered no harm as step two of the process was resolved in her favor. Courts in this circuit have agreed that failing to list a severe impairment at the second step of the process is not always reversible error. Indeed, the error does not require remand if two criteria are met: (1) the determination process continues to the next step; and (2) any functional effects of the disputed impairment are appropriately considered during the later steps of the process. *See Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D. W. Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D. W. Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made the threshold of severe impairment with other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to

find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D. W. Va. March 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."). A number of federal courts of appeal have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

The Commissioner contends that both criteria are present in this case; therefore, the ALJ's error was harmless. She argues that the process proceeded and the ALJ considered all of the symptoms associated with Claimant's syringomyelia when formulating the RFC finding. Claimant disagrees, asserting that the ALJ overlooked the condition at step two and forgot about it by step three, as evidenced by his failure to compare her medical findings to listing 11.19—the listing specifically designed to address syringomyelia. According to Claimant, the ALJ was obligated to make the comparison between her medical findings and the severity criteria of listing 11.19, given Claimant's contention that syringomyelia was the primary cause of her inability to work. The Commissioner responds to Claimant's step three argument by asserting that

the ALJ was not required to discuss listing 11.19, because Claimant clearly did not meet or equal that listing.

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 520; *see also* 20 C.F.R. §§ 404.1526 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the

37

severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan,* 493 U.S. at 531. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

In this circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F.Supp.2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a

comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91. Nonetheless, an ALJ need not repeat a review of the relevant medical evidence at every step of the process so long as "the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three." *McDaniel v. Colvin,* No. 2:14-CV-28157, 2016 WL 1271509, at *6 (S.D. W. Va. Mar. 31, 2016) (quoting *Kiernan v. Astrue,* No. 3:12CV459HEH, 2013 WL 2323125, at *17 (E.D. Va. May 28, 2013)); *also McCartney v. Apfel,* 28 F. App'x 277, 279 (4th Cir. 2002) ("As to McCartney's unsubstantiated claim that the ALJ must have analyzed the medical evidence at step three, rather than at step four, we agree with the district court that the ALJ need only review medical evidence once in his decision."); *and Dunford v. Astrue*, No. BPG–10–0124, 2012 WL 380057, at *3 (D. Md. Feb. 3, 2012) ("A remand is not warranted, however, where it is clear from the record which listing … [was] considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the Step Three analysis which allows this Court readily to determine whether there was substantial evidence to support the ALJ's Step Three conclusion."). Thus, the critical issue is whether the ALJ provided an explanation that directly connected the evidence to the requirements of the relevant listed impairment—not where in the written decision that discussion appears. *Shriver v. Comm'r, Soc. Sec. Admin.,* No. CV SAG-15-1014, 2016 WL 750548, at *4 (D. Md. Feb. 24, 2016). When "a fair amount of evidence exists" that a claimant meets a disability listing, but the evidence is rejected without discussion, "'insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings."' *Coe v. Berryhill,* No. 1:15CV1077, 2017 WL

886858, at *3 (M.D.N.C. Mar. 6, 2017) (quoting *Bailey v. Colvin,* No. 1:14CV303, 2015 WL 5227646, at *3 (M.D.N.C. Sept. 8, 2015)).

At the time of the ALJ's decision in the instant action, to meet or equal listing 11.19, Claimant must have demonstrated a diagnosis of syringomyelia with:

A. Significant bulbar signs; or
B. Disorganization of motor function as described in 11.04B.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, ¶ 11.19. Listing 11.04B described "disorganization of motor function" to be "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." *Id.* at ¶ 11.04B. Listing 11.00C extrapolated:

Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

Id. at ¶ 11.00C.

Claimant's medical records confirm the diagnosis of syringomyelia based upon radiographic findings. In addition, there is objective and subjective evidence contained in treatment records that Claimant experienced episodes of myoclonus, ataxia, reflex abnormalities, and sensory disturbances. Over a period of years, Dr. Demas observed Claimant's muscular contractions, unstable gait, visual disturbances, and bending limitations. (Tr. at 476). He also noted complaints of spasms, neuropathic pain, and peripheral neuropathy. (Tr. at 464). Similarly, Dr. Seeder documented Claimant's involuntary jerking movements, tingling in the lower extremities, trunk cramping, and

decreased reflexes in the knees and ankles. (Tr. at 386, 389-90). He observed her walking with an ataxic gait and witnessed involuntary quivering of her quadriceps. Dr. Johnson recorded Claimant's complaints of muscles weakness, clumsiness, difficulty walking, numbness, tingling, brisk reflexes, and abdominal muscle jerking. (Tr. at 368-69, 371-74). After witnessing Claimant's involuntary muscle contractures, Dr. Johnson diagnosed myoclonus likely related to a thoracic spinal cord injury. She described Claimant's symptoms as "vastly disruptive," causing left-sided bending and substantial gastrointestinal issues. Ted Garman, DPT, documented Claimant's complaints of pain and tingling in the bilateral extremities, numbness and tingling in the right toes, and left-sided muscle spasms causing jerking motions of the left back. (Tr. at 441-42). He also observed Claimant walking with an ataxic gait, with forward head and rounded shoulders. Claimant displayed notable chest breathing with minimal diaphragmatic control, obvious quadratus lumborum spasm on the left causing significant jerking and hip hiking. In August 2014, Dr. Mary Maurer of the CAMC Family Practice Clinic noted that Claimant had decreased strength in her upper and lower extremities with hypertonicity of the bilateral thoracic paraspinals and decreased sensation in varying patterns. (Tr. at 724). All of these findings provide some factual support that listing 11.19 could be met or equaled.

Nonetheless, notwithstanding the diagnosis of syringomyelia and the clinical notes substantiating a thoracic spine disorder, the ALJ did not—at any point in the written decision—review this significant medical evidence. Notably, the ALJ never discussed the treatment records supplied by Dr. Demas, Dr. Seeder, Mr. Garman, or the clinical findings of Dr. Johnson, all of whom repeatedly documented signs and symptoms pertinent to an assessment of listing 11.19. While an ALJ is not required to

discuss every page of medical evidence, his opinion "must contain 'sufficient reasons for all material findings of fact and conclusions of law that the reviewing court can discern what the ALJ did and why he did it.'" *Johnson v. Colvin*, No. 5:13-CV-509-FL, 2014 WL 4636991, at *6–8 (E.D.N.C. Sept. 16, 2014) *(*quoting *Redmond v. Astrue,* No. 4:08–CV–14–FL, 2009 WL 863587, at *3 (E.D.N.C. Mar. 24, 2009)). Here, the ALJ implicitly found Claimant's syringomyelia (1) to be non-severe; (2) not to meet or equal the relevant listing; and (3) to be without specific associated functional impairments. Yet, he never provided an explanation for those material findings and conclusions.

The Commissioner insists that the ALJ's decision, when read as a whole, clearly demonstrates that Claimant did not meet listing 11.19. The undersigned finds, to the contrary, that there is no analysis anywhere in the written decision that addresses all aspects of listing 11.19. As the Commissioner emphasizes, the ALJ did discuss some of Claimant's medical imaging, and noted that her gait, station, and musculoskeletal findings were normal on one consultative examination. However, the ALJ never mentioned, let alone analyzed, how the aforementioned clinical notes and findings compared to the severity criteria of listing 11.19; not even indirectly. In particular, the ALJ never considered whether and to what extent Claimant's myoclonus and its related symptoms affected her gross movements, or to what extent they may have interfered with her locomotion on a consistent and sustained basis; such as over an eight-hour workday. While the record suggests that Claimant's myoclonus did not regularly affect the muscles of her extremities, it did affect her trunk, her back, her posture, her hip placement, and her gastrointestinal tract, which conceivably could have substantially impeded her gross movements and locomotion. In addition, Claimant complained of sensory disturbances, including visual abnormalities, and tingling and numbness of

extremities. She had frequent migraine headaches. The ALJ never effectively reviewed the evidence associated with these symptoms. The ALJ's step three and physical RFC discussions were so focused on Claimant's bones, discs, and joints that the written decision does not clearly reflect a full consideration of the neurological sequelae associated with Claimant's syringomyelia.

The medical record regarding the effects of Claimant's syringomyelia on her ability to engage in sustained work activity "is not so one-sided that one could clearly decide, without analysis, that Listing [11.19] is not implicated." *Brown v. Colvin,* 639 Fed.Appx. 921, 923 (4th Cir. 2016). The Fourth Circuit has made it clear that district courts, when reviewing an ALJ's decision, may not engage in an analysis of the evidence "that the ALJ should have done in the first instance." *Fox v. Colvin,* 632 Fed. Appx 750, 755 (4th Cir. 2015). In other words, if an analysis of the evidence is required in order to determine whether a claimant meets a particular listing, the ALJ, not the court, must perform that analysis. *Torres v. Comm'r, Soc. Sec. Admin.,* No. SAG-15-3294, 2016 WL 5108022, at *2 (D. Md. Sept. 20, 2016); *see, also, Dail v. Colvin,* No. 1:16CV70, 2016 WL 6997502, at 6 (M.D.N.C. Nov. 30, 2016) (holding that the Brown decision "provides clear caution to this Court with respect to any attempt to review the medical record to find facts to support or refute the ALJ's finding" at step three); *and Robinson v. Astrue*, 667 F. Supp. 2d 834, 841–44 (N.D. Ill. 2009) ("The Commissioner claims that the above-mentioned evidence is ultimately insufficient to support a finding of disability. But this misses the point: the question is not whether the ALJ should have concluded that Robinson met Listing 11.19's requirements; it is only whether the evidence was substantial enough to require the ALJ to discuss the Listing.").

43

The Commissioner relies on *Polion v. Colvin,* a case from the Central District of California, to support her position that the ALJ's step three review was acceptable. *Id.,* No. SACV 12-0743-DTB, 2013 WL 3527125, at *2-4 (C.D. Cal. Jul. 10, 2013). In *Polion*, the district court affirmed the Commissioner's decision of nondisability despite finding that the ALJ had erred when he provided only a conclusory explanation for his determination that the claimant did not meet listing 11.19. The Commissioner's reliance on *Polion* is misplaced for several reasons. First, unlike the ALJ in this case, the ALJ in *Polion* did consider listing 11.19. Second, the ALJ in *Polion* obtained testimony at the administrative hearing from a medical expert, who specifically compared the record evidence against the criteria of listing 11.19. In the instant case, none of the consultants considered or discussed listing 11.19 in their assessments. Finally, and most importantly, in order for the *Polion* court to affirm the ALJ's step three finding, the court had to conduct its own analysis of the evidence, providing factual support for the ALJ's conclusion, which the ALJ had not identified himself. Consequently, rather than simply reviewing the propriety of the ALJ's decision, the *Polion* court proceeded to perform the very type of factual analysis the Fourth Circuit has found inappropriate. *Brown*, 639 Fed.Appx. at 923 ("Further, we do not accept Brown's and the Commissioner's invitations to review the medical record de novo to discover facts to support or refute the ALJ's finding at Step Three, and it was error for the district court to do so. Instead, we remand to avoid engaging in fact-finding 'in the first instance' and to allow the ALJ to further develop the record so that we can conduct a meaningful judicial review in the event the case returns to us.").

The Commissioner also argues that the ALJ relied on the agency consultants, who considered Claimant's syringomyelia and, therefore, the ALJ did not have to

explain his analysis of the functional impact of that impairment. However, as pointed out, the consultants did not consider listing 11.19. Moreover, the ALJ did not adopt the agency consultants' RFC findings and made no alternate findings specific to syringomyelia. Furthermore, "[w]hile the ALJ may rely on the opinion of a State agency medical consultant in conducting a listing analysis ... the ALJ ultimately bears the responsibility for deciding whether a claimant's impairments meet or equal a listing." *Stawaisz v. Colvin,* No 815CV04542JMCJDA, 2017 WL 604987, at *10 (D.S.C. Jan 26, 2017); *also Radford*, 734 F.3d at 295 ("The ALJ cited the state medical opinions in support of his [step three] conclusion, but that is not enough to constitute 'substantial evidence.' Even if the ALJ's exclusive citation to those opinions indicates the (apparently very high) evidentiary weight he placed on them, it does not indicate *why* the opinions merit that weight.").

Lastly, assuming *arguendo* that the ALJ's step three determination was correct, the undersigned disagrees that the RFC analysis met regulatory standards. While the ALJ's RFC finding was quite detailed, the accompanying discussion was, unfortunately, rather sparse and ambiguous. Not only did the ALJ fail to mention significant evidence, but he never actually addressed a host of Claimant's symptoms. To what degree, if any, Claimant's spinal disorder (syrinx), migraine headaches, myoclonus, its related symptoms, and chronic pain influenced Claimant's ability to perform basic work activities is unclear. Moreover, although the evidence was inconsistent, the ALJ never reconciled the inconsistencies at any point in the written decision.

In summary, the undersigned **FINDS** that the ALJ erred at steps two and three by failing to consider Claimant's syringomyelia and its related symptoms.

Furthermore, the undersigned **FINDS** that the errors by the ALJ were not harmless. As this court is precluded from reviewing the medical record *de novo* and making factual and administrative findings, the case should be remanded to allow the ALJ to conduct the necessary analysis and provide a meaningful explanation for his conclusions.

### B. Credibility Analysis

In view of the undersigned's recommendation that the case be remanded for further development of Claimant's syringomyelia and its functional impact on Claimant's ability to perform basic work activities, a detailed discussion of the ALJ's credibility analysis is unnecessary. However, the undersigned **FINDS** that while the ALJ followed the requisite two-step process, his discussion is inadequate for the above-stated reasons. In addition, the ALJ incorrectly discounted Claimant's credibility on the basis that she complained of migraine headaches even though her brain MRI was normal. It is generally accepted that a normal brain scan does not rule out the presence of migraine headaches.[4] *See Means v. Colvin*, No. 2:15-CV-01107-TFM, 2016 WL 3386814, at *5 (W.D. Pa. June 20, 2016) (citations omitted) (recognizing that "[b]rain scans and physical examinations cannot detect migraine headaches."). As such, as the *Means* court points out, "an ALJ must be particularly diligent in making [credibility] determinations regarding migraine headaches because laboratory tests cannot prove their existence." *Id.*

Although the ALJ gave what might be legitimate reasons for discounting

---

[4] *See, e.g., Most Headache-Related Brain Scans are not Needed.* D. Pendick, Harvard Health News, Harvard University (2014) ("Out of all the brains scans done for headache, perhaps 1% to 3% will reveal something abnormal.")

Claimant's credibility, his discussion simply does not demonstrate that he considered the nuances associated with syringomyelia, neuropathy, and migraine headaches. Consequently, on remand, the ALJ should reconsider the evidence, applying the factors set forth in 20 C.F.R. §§ 404.1529, 416.929, to determine the reliability of Claimant's statements.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for summary judgment, (ECF No. 9), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by

the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** April 27, 2017

Cheryl A. Eifert
United States Magistrate Judge

48